## SUPREME COURT.

Shepard, plaintiff in error agt. The People, defendants in error.

The plaintiff in error was convicted in June, 1857, of *arson in the first degree,* and sentenced to the punishment then prescribed by statute, which was *death.*

An act of the legislature was passed in 1860, dividing murder into two degrees, and provided that every person thereafter convicted of murder in the *second degree,* should be sentenced to *imprisonment for life;* and abolished the punishment of death for arson in the first degree. It also made the punishment for murder in the second degree applicable to all crimes that were then punishable with death, except treason and murder in the first degree:

*Held,* that although the punishment of the offence of which the plaintiff in error was found guilty, existing at the time of its commission, having been afterwards abolished, and a new and totally different punishment substituted in its place, the legislature intended the act of 1860 to apply the punishment of imprisonment for life to arson in the first degree, committed *before* as well as after the passage of the act, and as the change was a *mitigation* of the punishment, the act in this respect was not *ex post facto*. (*This decision sustains that of Hartung agt. The People,* 22 *N. Y. R.,* 95; *but whether the opinion in that case would sustain this decision, quere ?*)

*New York General Term, May,* 1862.

WRIT OF ERROR to the court of general sessions of the city, of New York.

By the court, CLERKE, Justice.   The offence of which the plaintiff in error was convicted in the court of general sessions, was committed on the 9th of June, 1857.   In April, 1861, he was tried and found guilty; and on the 13th of the same month, the sentence of imprisonment for life in the state prison was pronounced against him.   The offence, for the commission of which he was found guilty and sentenced, was arson in the first degree.

When the offence was committed, the punishment, pre-scribed by the statute then existing, was death.   On the 14th of April, 1860, an act was passed, dividing murder into two degrees, and which, among other things, provided that every person thereafter convicted of murder in the second degree, should be sentenced to imprisonment in a state prison for the term of his natural life ; the seventh section abolished the punishment of death for arson in the first degree ; and the ninth section made the punishment of murder in the second degree applicable to all crimes that were then punishable with death, except treason and murder in the first degree.   This section, therefore, included arson in the first degree.   The act of 1860 thus changed the punishment of arson in the first degree from death to imprisonment for life.

The question presented in the case before us is, whether the plaintiff in error, at the time of his sentence, was liable to any punishment ; the punishment of the offence of which

he was found guilty, existing at the time of its commission, having been afterwards abolished, and a new and totally different punishment substituted in its place.

I. It is contended, in the absence of express words in the statute of 1860 manifesting an intent to make it retroactive, that no court should so construe it. Undoubtedly, retrospective legislation, as a general rule, is not to be presumed. In the language of KENT, Ch. J., in *Dash* agt. *Van Kleeck,* (7 *John. R.,* 677,) we are not to presume out of respect to the lawgiver, " that the statute was meant to operate retrospectively ; and, if we call to our attention the general sense of mankind on the subject of retrospective laws, it will afford us the best reason to conclude that the legislature did not intend in this case to set so pernicious a precedent. How can we possibly suppose that in so unimportant a case, when there were so strong passions to agitate, and so great interests to impel, that the legislature coolly meant the prostration of a principle which has become venerable for the antiquity and universality of its sanction, and is acknowledged as an element of jurisprudence ?"

But, no one can examine the opinions of elementary writers and judges on this subject, without being convinced that the rule of construction, which presumes against the intention of the legislature to make a law retrospective, applies only to cases where a contrary rule would interfere with vested rights. It would be manifestly unjust to suppose that it was intended in any case to deprive a citizen, by a new law, of rights which he had acquired under an old law. To quote the instance mentioned by Puffendorf: " If a law exists allowing the father of a family to dispose of property by will, the legislature may, without doubt, restrain this unlimited right of disposing by will ; but it would be unjust to take away the property acquired by will during the existence of the former law." In other words, we are never to presume any legislative interference

with vested rights. But, it may be affirmed, with equal emphasis, that we are never to presume any legislative interference, detrimental to the good order and safety of society. We are never to infer that the legislature intended to absolve from all punishment persons who had been guilty of the most odious and dangerous crimes. Can this be even plausibly alleged ? No one can, surely, maintain that the legislature, at the time it enacted the statute altering the punishment of arson in the first degree, intended that all persons, who had been previously guilty of this atrocious crime, should be released from all liability, and should be forthwith exempted from all punishment. This would be little else than assuming that they were as faithless to society, and as hostile to its dearest interests, as the culprits whom they absolved. But, fortunately, the law abounds with principles of construction that limit and regulate the principles which the counsel for the plaintiff in error asserts, and to which I have referred. One of these is, when great public inconvenience will result from a particular construction, that construction is to be avoided, unless the meaning of the legislature is plain. (*Fisher* agt. *Blight*, 2 *Cranch*, 386.)

When words in a statute are express, clear and plain, they ought to be understood according to their genuine and natural signification, unless, by such exposition, a contradiction or inconsistency would arise in the statute by reason of some subsequent clause, from whence it might be inferred that the intent of the legislature was otherwise. And this holds with regard to penal as well as other acts. (*Parker*, 233; *Hob.*, 93–97.) Such construction ought to be put upon a statute as may best answer the intention which the makers had in view; for *qui hæret in litera, hæret in cortice.* (*Plow.*, 232; *Kerlin* agt. *Bull*, 1 *Dall.*, 178; *and numerous cases quoted in Bacon's Abridgement, under title Statute S.*)

It would be disregarding and doing gross violence to

those principles to suppose that the legislature of this state, by the act of 1860, designed to absolve from punishment all persons who had committed the crime of arson in the first degree, previous to the passage of that act.

Undoubtedly, " after the expiration or repeal of a law," to use the words of Chief Justice MARSHALL, in *Yeaton* agt. *United States*, (*Cranch*, 281,) " no penalty can be enforced or punishment inflicted for a violation of a repealed law, committed while it was in force, unless some special provision be made for that purpose by statute." But I hold that in the present case, the statute of 1860 has made a special provision for the punishment of arson in the first degree, committed previous to its enactment. As I have endeavored to show, we are never to presume that the legislature intended to absolve persons who had committed such a crime, from all punishment ; and, while there is any provision of the statute which, by reasonable interpretation, may be deemed to ignore that presumption, we cannot impute such an intention. The ninth section contains this provision ; and, unless we gratuitously assume this intention, there is no reason why it should not apply to offences committed before as well as after the passage of the act.

II. Assuming, then, that the legislature, by the act of 1860, provided for the punishment of persons who committed arson in the first degree previous to the passage of that act, by imprisonment in one of the state prisons for life, is it of such a character as to make it unconstitutional ?

It is contended, as it creates a new punishment for the offence, different from that which existed at the time when it was committed, it is *ex post facto* in its operation, and for that reason is unconstitutional and void.

I know it has been maintained, in some cases, that to abolish the penalty which the law attached to a crime when it was committed, and to declare it to be punishable in another way, is, as respects the new punishment, the essence of an *ex post facto* law. But this proposition is

scarcely warranted by authority.    The elementary writers define an *ex post facto* law to be that which, after an action, indifferent in itself, is committed, the legislature then, for the first time, declares it to have been a crime, and inflicts a punishment on the person who has committed it, or enhances the punishment or penalty of an offence after it has been committed.    (*Blackstone*, 46 ; 9 *Bacon's Abridgement, title Statute E ; and the numerous American cases referred to in the Philadelphia edition of the latter work*— 1861.)    The definition of Judge CHASE, in his opinion in *Calder* agt. *Bell*, (3 *Dall.*, 386,) gives a somewhat more comprehensive definition.    He says : " An *ex post facto* law is : *First*, any law which makes an act done before the passing of the law, and which was innocent when done, criminal.    *Second*, any law which aggravates a crime, and makes it greater than when it was committed.    *Third*, any law which changes the punishment and inflicts a greater punishment than the law annexed  to the crime when committed.    *Fourth*, any law which alters  the legal rules of evidence."

The third section only of this definition can apply to the case before us.    Does the statute of 1860 inflict a greater punishment than the law annexed  to the crime when committed ?    It changes the punishment, no doubt, but does it also—for this is necessary to make it *ex post facto*—inflict a greater  punishment than the law annexed  to the  crime when committed ? Is the change from death to imprisonment for life an aggravation of punishment ?  In answering this question, we are not to speculate upon what individuals may prefer under certain circumstances and in exceptional instances ; but we are to consider which punishment would be preferable in the general estimation of mankind.    We are not to take the sentiments of those as our guide, who, depressed by years of protracted reverses, by cruel disap-·pointment, or by the treachery and ingratitude of friends sunk into a morbid mental condition, prefer death to life.

Shepard agt. The People.

Life, to many, is a burden, and even an agony; and how often are men their own executioners? But surely this condition of mind is exceptional. Nothing, in the great multitude of instances, is clung to with more tenacity than life; nothing is regarded with more dread than death. What will not a man give for his life? "All that a man hath will he give for his life." This is the sentiment deeply implanted in the human heart by the Maker of it, for the wisest purposes—the conservation of life and the perpetuity of mankind. It would be a manifest disregard, therefore, of sentiments which abide so deeply in our nature, and which experience teaches that nothing but a morbid condition of the mind can suppress, to say that the change of punishment from death to imprisonment for life is a greater punishment; and that it is not, on the contrary, a mitigation of punishment. To say this, would not only be palpably at variance with the known instincts of human nature, but would be contrary to the whole course of legislation itself, in all communities, and under all forms of government. The dread penalty of death is elevated in terror and ignominy, above every other kind of punishment. It is reserved for those crimes which society most abhors, and which it is most necessary to discourage by apprehensions that are likely to exercise the greatest influence over men, in deterring them from the conception and execution of such crimes. Legislators well know that no apprehension inspires a more effectual terror than that of death; and although when the malignant passions are once aroused to such a degree as to impel men almost irresistibly to guilty deeds, this terror operates, in innumerable instances, to restrain them in the beginning, and to prevent them from yielding to the first suggestions of crime. I am aware that these views seem to be at variance with those intimated by Judge DENIO, in *Hartung* agt. *The People*, (22 *N. Y. R.*, 104, &c.) But the opinions which he intimated on this point were not essential to the determination of the case.

and did not at all constitute any of the elements of the decision.    In that case it was decided, so far as the act in question subjected persons already under conviction for murder to the punishment of death and previous imprisonment at hard labor, that it was *ex post facto* and void.    In such cases the punishment was undoubtedly increased, by adding to the punishment of death the preliminary punishment of hard labor for one year.    I think that this was as certainly an aggravation, as the change from death to imprisonment for life, in the case of arson in the first degree, was a mitigation of the punishment.

I regard the distinction made in the opinion to which I have referred, between punishments separable and not separable, as entirely imaginary, and useless in ascertaining the intention and determining the power of the legislature. In what the judge calls separable punishments, the punishment is lessened in amount; as, in the instance he states, where the punishment is fine and imprisonment, a law dispensing with either the fine or imprisonment would be reducing the amount of the punishment.    But may not punishment also be lessened by changing the degree, as well as by reducing the amount?    In other words, may it not be mitigated by changing its quality as well as by changing its quantity?    And this, I have endeavored to show, is effected in the act of 1860, by changing the punishment of arson in the first degree, from death to imprisonment for life.

Being of the opinion that the legislature intended, in the act of 1860, to apply the punishment of imprisonment for life to arson in the first degree, committed before as well as after the passage of the act, and that, in this respect, the law was not *ex post facto*, the judgment of the court of general sessions should be affirmed.